UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

Devon Tyron Evans,

          Plaintiff,

    vs.

Eric Hansen,

          Defendant.

Case No. 20-CV-00860

**DEFENDANT'S MEMORANDUM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

Defendant Eric Hansen, by his attorneys, Gunta Law Offices, S.C., submits this Memorandum in Support of his Motion for Summary Judgment seeking dismissal of Plaintiff's claims. The Motion and Memorandum are supported by Defendant's Proposed Findings of Fact and the Declarations of Eric Hansen, Christopher Bellows, Donovan J. Carlson, Barry Babler and Jasmyne Baynard, filed herewith.

**PREFACE[1]**

On November 6, 2018, Menomonee Falls Police Officer Eric Hansen shot Plaintiff, Devon Evans, after pursuing Evans on foot and believing Evans was carrying a weapon and threatening to harm officers. After leading police on a pursuit through residential areas of Menomonee Falls, and breaking into a home and assaulting a homeowner, Evans retreated, hiding behind the deck attached to a church. Evans ignored Officers' commands to show his hands, and hid from officers, while appearing to be armed with a gun. Defendant Officer Hansen, fearing the Plaintiff was going

---

[1] All relevant facts are set forth in Defendants' Proposed Findings of Fact (hereinafter DPFF).

to shoot one of the officers coming around the corner and approaching the area where Plaintiff was hiding, discharged his duty weapon to stop what Hansen perceived as a threat to officer safety.

Plaintiff brought this suit alleging that Officer Hansen used excessive force while attempting to arrest him, thereby violating Plaintiff's rights under the Fourth Amendment. (Dkt. 1, Complaint, ¶ 31; *see also* Dkt. 7, Screening Order) Officer Hansen denies violating the Plaintiff's constitutional rights and moves for summary judgment seeking dismissal of Plaintiff's suit in its entirety.

## DISCUSSION

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party has the initial burden to demonstrate that it is entitled to judgment as a matter of law – that no reasonable jury could reach a verdict in favor of the non-moving party. *Celotex*, 477 U.S. at 323; *Matsushita Electronics, Co., Ltd., v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986)("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."). Once this burden is met, the opposing party must go beyond the pleadings and designate the specific facts showing there is a genuine issue. *Anderson v. Liberty Lobby*., 477 U.S. 242 (1986). The mere existence of some alleged factual dispute will not defeat summary judgment. The requirement is there be no genuine issue of material fact. *Id*. at 247-248. Nor will speculation, hearsay or conclusory allegations suffice. *Gorbitz v. Corvilla*, 196 F.3d 879 (7th Cir. 1999).

**ARGUMENT**

I.  **Officer Hansen Did Not Violate Plaintiff's Fourth Amendment Rights.**

   A.  **Legal Standard**

The crux of Plaintiff's claim is that Officer Hansen used excessive force against him. A police officer's use of deadly force on a suspect is a seizure within the meaning of the Fourth Amendment, so the force must be reasonable to be constitutional. *Scott v. Edinburg*, 346 F.3d 752, 755 (7th Cir. 2003). The Supreme Court set out the fundamental framework for analyzing excessive force claims in *Tennessee v. Garner*, 471 U.S. 1(1985), and *Graham v. Connor*, 490 U.S. 386 (1989). *Graham* and *Garner* stand for the proposition that when a police officer reasonably believes a suspect's actions place "him, his partner, or those in the immediate vicinity in imminent danger of death or serious bodily injury, the officer can reasonably exercise the use of deadly force." *Sherrod v. Berry*, 856 F.2d 802, 805 (7th Cir. 1988); *Scott*, 346 F.3d at 757.

As a form of defense of others, a police officer also may constitutionally use deadly force to prevent escape.

> Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

*Garner*, 471 U.S. at 11–12.

Reasonableness is not based on hindsight, but rather is determined considering the perspective of the officer on the scene, allowing "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S.

386, 396–97; *Scott*, 346 F.3d at 756. The test for reasonableness under the Fourth Amendment requires an analysis of the totality of the circumstances assessed "from the perspective of a reasonable officer on the scene, rather than with 20/20 hindsight." *Graham*, 490 U.S. at 97. This perspective is critical.

In seeking to understand the perspective of the officer on the scene, Courts consider: the information known to the officer at the time of the encounter; the duration of the encounter; the level of duress involved; "and the need to make split-second decisions under intense, dangerous, uncertain, and rapidly changing circumstances." *Horton v. Pobjecky*, 883 F.3d 941, 950 (7th Cir. 2018); *see also Graham*, 490 U.S. at 396–97. Finally, "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id*. at 397.

To succeed on his excessive force claim, Plaintiff must show Officer Hansen's use of force was objectively unreasonable from the perspective of a reasonable officer on the scene under the totality of the circumstances. *Id*. at 396–97. Applying the principles above to the facts of this case, it is clear that Officer Hansen was justified in using deadly force to stop the threat posed by Plaintiff.

> **B. No Reasonable Jury Could Find That Officer Hansen Violated Evans' Fourth Amendment Rights Under the Circumstances.**

An assessment of Officer Hansen's use of force requires careful attention to the information and perceptions that he gathered during his interactions on November 6, 2018 prior to the shooting. *See Cty. of Los Angeles, Calif. v. Mendez*, 137 S. Ct. 1539, 1546 (2017). Most relevant, however, is the information and perception of Officer Hansen at the moment that he decided to use deadly force. *Muhammed v. City of Chi*., 316 F.3d 680, 683 (7th Cir. 2002).

Plaintiff was believed to have been involved in a gas station drive off theft of gasoline and, while being pulled over, sped away from Menomonee Falls Police Officer Brooks. (Defendant's PFOF 6-8) While speeding away from Officer Brooks, Plaintiff nearly struck another vehicle. (DPFF 9) After stopping his vehicle a second time, Plaintiff got out of his car and fled on foot into a residential subdivision. (DPFF 9) Officer Hansen knew this information as he was monitoring radio traffic. (DPFF 11)

Numerous Menomonee Falls Police Officers, including Officer Hansen, responded to the residential area where Plaintiff was seen fleeing and attempted to locate him. Officers were not initially successful in locating Plaintiff and, therefore, set up a perimeter to contain him. (DPFF 12)

A female flagged down Officer Hansen and informed him that the suspect was hiding in the back yard of a blue house near Pheasant Lane. Officer Hansen broadcast that information to all squads. (DPFF 13) While the officers were searching for the suspect Plaintiff, they were approached by a homeowner who reported that he was sleeping when the Plaintiff broke into his residence. The homeowner told him to get out and Plaintiff initially ignored him and ran into the garage. Plaintiff fought with the homeowner in the garage and then fled the residence. (DPFF 14)

Menomonee Falls Police Officers set up a new perimeter and Officer Hansen continued to search for the Plaintiff. While setting up a perimeter, Detective Bellows observed the Plaintiff running towards Officer Hansen. Detective Bellows immediately became concerned for Officer Hansen's safety and stopped his squad and yelled to Officer Hansen that the suspect was rapidly encroaching on his position. (DPFF 15)

As Detective Bellows alerted Officer Hansen, Officer Hansen observed the Plaintiff running through the backyards. (DPFF 16) Officer Hansen was concerned by the way Plaintiff

was running as it appeared that he was holding something in his hands, consistent with someone carrying a rifle. (DPFF 17)

As Officers Hansen, Carlson, and Detective Bellows continued to pursue him, the Plaintiff quickly rotated his upper body towards Officer Hansen and pointed what appeared to be a long gun and yelled either, "Fucking shoot me," or "Fuck you, shoot me." (DPFF 19) Officer Hansen called out over the radio that he had a visual of Plaintiff. At that point, Officer Carlson saw Plaintiff run across Crosswood Drive holding something in his right hand that appeared to be a black handgun. Officer Carlson heard Plaintiff yelling, "I'll shoot, I'll shoot." (DPFF 20)

Officer Hansen drew his handgun, identified himself, and commanded Plaintiff to stop. Plaintiff did not stop and instead turned his body towards Officer Hansen. At that time, Officer Hansen observed Plaintiff carrying an elongated black object, which he believed to be a gun. (DPFF 21)

Given the circumstances, Officer Hansen believed Plaintiff was armed. Officer Hanson was concerned because Plaintiff continued to flee and was not obeying officer commands to stop. (DPFF 22)

At that point, Officer Hansen was in fear of imminent danger to his life. Officer Hansen could not isolate Plaintiff and did not discharge his weapon at that time because Plaintiff was moving. Officer Hansen was also concerned because the area behind where the Plaintiff was running was a busy street, with traffic traveling both ways. (DPFF 27)

Plaintiff continued to flee from Officer Hansen. He continued southbound crossing Countryside Drive between two residences towards the River of Life Church. Officer Hansen believed Plaintiff was armed and broadcast, "Watch his hands," and that Plaintiff had run toward the River of Life Church. (DPFF 28)

6

Detective Babler entered the church property and observed Plaintiff emerge between a pine tree and a deck on the south side of the church. Detective Babler unholstered his duty weapon, pointed it at Plaintiff, and ordered him to get on the ground. (DPFF 30) Plaintiff ignored Detective Babler's command and continued moving towards the rear of the church and ultimately concealed himself behind garbage cans. (DPFF 31)

Plaintiff then quickly stood up, which caused Detective Babler to immediately take up a position of cover behind the church. At that point, Detective Babler feared for his safety as be believed Plaintiff's hand position indicated that he was holding a weapon. (DPFF 32)

Officer Hansen made his way to the rear of the church and located Plaintiff hiding behind the deck attached to the rear of the church. Plaintiff had his back turned to Officer Hansen and appeared to be kneeling with a long gun pointed at the southeast corner of the church. (DPFF 33)

At that time, Officer Hansen saw Detective Babler's squad on Pilgrim Road and anticipated that he would be pulling into the church parking lot. Based on Plaintiff's positioning, which appeared to be a "target acquisition position," Officer Hansen feared that this would put Detective Babler and any other officer who responded and came from the side of the church, in a position to be ambushed. (DPFF 34) Based on the totality of the circumstances, that the Plaintiff ignored multiple commands, suddenly ceased all movement, and hunkered down with what appeared to be a long gun, Officer Hansen believed there was an imminent danger to the responding officers. (DPFF 35)

Detective Babler also felt Plaintiff's actions were threatening and Detective Babler was concerned for Officer Hansen who was in an open area and did not have the benefit of any concealment or cover. This, combined with prior observations of the suspect and the appearance

7

that he was armed, made Detective Babler fearful that Plaintiff would harm Officer Hansen. (DPFF 36)

Officer Hansen feared that the Plaintiff was going to shoot another officer coming around the corner of the church. At that point, Officer Hansen believed he needed to stop the threat posed by the Plaintiff and discharged his duty weapon at Plaintiff's upper torso to stop the threat. (DPFF 37) At the time Officer Hansen fired his duty weapon, Plaintiff was visible, and Officer Hansen had target acquisition, identification, and isolation. Officer Hansen observed Plaintiff fall and believed there was no longer an imminent threat. (DPFF 38)

At the time Officer Hansen discharged his duty weapon, he perceived that Plaintiff posed a threat of imminent death or great bodily harm to the officers who were responding to the scene. (DPFF 39)

Reasonableness in this context is analyzed from "the perspective of a reasonable officer on the scene, rather than with 20/20 hindsight." *Graham*, 490 U.S. at 97. Not only did Officer Hansen articulate why he reasonably perceived the Plaintiff posed a deadly threat, but his perception is also supported by the testimony of multiple law enforcement officers on scene for the events leading up to the shooting who also perceived Plaintiff as a deadly threat.

Detective Bellows also saw the Plaintiff running through the yards with his arms tucked into his body as if he were concealing something and was concerned it might be a weapon. (DPFF 23) Detective Bellows put his squad in park, drew his firearm, and commanded the Plaintiff to stop, but he ignored Detective Bellows' command and continued to flee. (DPFF 24)

As he fled, the Plaintiff bladed his body back towards Detective Bellows in a shoulder shift. This was a suspicious furtive movement that caused Detective Bellows to believe that Plaintiff was challenging him to do something. Detective Bellows continued to issue commands

8

to Plaintiff, which Plaintiff continued to ignore as he fled in a southern direction. (DPFF 25) Given the totality of the circumstances that Plaintiff had fled officers, ignored commands, and appeared to be armed, Detective Bellows believed that Plaintiff posed an imminent threat to Officer Hansen, other officers, himself, and homeowners in the surrounding residential area. (DPFF 26)

Officer Carlson was also concerned that Plaintiff posed an imminent threat to the Officers and/or others in the residential area, as he had fled Officers, ignored commands, appeared to be armed, and yelled, "I'll shoot." (DPFF 29)

Finally, Detectives Bellows and Babler both believed that Plaintiff was armed at that time Officer Hansen discharged his duty weapon. (DPFF 41-42)

The critical Fourth Amendment inquiry in this case is whether at the moment Officer Hansen fired his weapon, he reasonably perceived that the Plaintiff posed an immediate threat to him or others. As demonstrated by the factual record and, most importantly, the perception of the on-scene officers, Officer Hansen did reasonably perceive Plaintiff as an immediate threat; therefore, the use of deadly force was constitutionally permissible. *See DeLuna v. City of Rockford*, 447 F.3d 1008, 1011–12 (7th Cir. 2006) (an officer's use of deadly force was reasonable when suspect said "I've got something for you. You are going to have to kill me," and refused to raise his hands or stop walking toward the officer). See, e.g., *Henning v. O'Leary*, 477 F.3d 492, 495–96 (7th Cir. 2007) (concluding deadly force was reasonable where suspect resisted arrest).

Based on the facts taken as a whole, without benefit of 20/20 hindsight, a reasonable officer would have reasonably believed that Plaintiff posed an imminent threat of death or great bodily harm to himself, the other officers at the scene, and any civilians in close proximity. This is based on Plaintiff's repeated refusal to stop and obey Officer Hansen and other Menomonee Falls police officers. Further, Plaintiff appeared to be armed with a firearm. He demonstrated a clear

9

unwillingness to stop for anybody or anything. A reasonable officer would have concluded that Plaintiff was going to shoot any person coming up the driveway of the church, which in fact Detective Babler was doing.

For these reasons, Plaintiff cannot meet a key element of his excessive force claim and Officer Hansen is entitled to summary judgment.

## II. Officer Hansen Is Entitled To Qualified Immunity.

### A. Legal Standard

The doctrine of qualified immunity "balances two important interests the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The doctrine shields government officials from civil liability insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Id*. In the context of the Fourth Amendment, a police officer is entitled to qualified immunity where clearly established law does not show that the seizure violated the Fourth Amendment. *Anderson v. Creighton*, 483 U.S. 635, 641 (1987).

Qualified immunity is an affirmative defense, but plaintiffs carry the burden of defeating it once it is raised. *Archer v. Chisholm*, 870 F.3d 603, 613 (7th Cir. 2017). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011); *see Pearson v. Callahan*, 555 U.S. at 231 (protection of qualified immunity applies regardless of whether government official's error is mistake of law, mistake of fact, or mistake based on mixed questions of law and fact. Therefore, if reasonable minds would differ as to whether the official's conduct was clearly illegal, then immunity should attach. *See*, e.g., *Malley v. Briggs*, 475 U.S. 335, 341(1986).

The Supreme Court has explained that the clearly established right must be defined with specificity, a principle which is "particularly important in excessive force cases." *City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500, 503 (2019) (*per curiam*) (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018)).

> Specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue.
>
> It does not suffice for a court simply to state that an officer may not use unreasonable and excessive force, deny qualified immunity, and then remit the case for a trial on the question of reasonableness. An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.

*See id.*

Among the issues for which governing precedent must account in excessive force cases are the actions of the individual claiming wrongdoing and the time the officer had to react to the situation. *See, e.g., Kisela*, 138 S. Ct. at 1153 (holding that qualified immunity was required for officer who shot individual after having "mere seconds to assess the potential danger" posed by individual to their person, who was observed "hacking a tree with a large kitchen knife," and who had "failed to acknowledge at least two commands to drop the knife"); *Dockery v. Blackburn*, 911 F.3d 458, 461 (7th Cir. 2018)(affirming repeated use of Taser where plaintiff "kicked, attempted to stand up, and otherwise resisted commands to submit to their authority"); *see also, e.g., Mason-Funk v. City of Neenah*, 895 F.3d 504, 510 (7th Cir. 2018) ("To drive home the point, it is worth recounting what occurred in the short span of six minutes. Flathoff had continuously made threats

that he would kill the hostages...."); *cf.*, e.g., *Graham*, 490 U.S. at 397 (1989) ("[P]olice officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.").

### B. Officer Hansen's Use of Force Did Not Violate Clearly Established Law.

*Garner* and *Graham*, which set forth the long-established factors to consider in evaluating a claim for excessive force, do not by themselves create clearly established law. *Kisela*, 138 S. Ct. at 1153. Nonetheless, those factors provide the appropriate starting place for evaluating the reasonableness of Officer Hansen's actions. In both *Tennessee v. Garner*, 471 U.S. 1 (1985), and *Graham v. Connor*, 490 U.S. 386 (1989), the Supreme Court addressed the constitutionality of excessive and deadly force. In *Garner*, the Court held that "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." 471 U.S. at 11. In *Graham*, the Court held that evaluating the reasonableness of an officer's use of force "requires careful attention to the facts and circumstances of each particular case, including ... whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." 490 U.S. at 396.

No clearly established law rendered Officer Hansen's use of deadly force to stop the active threat posed by Plaintiff–who was a fleeing felon, that he believed to be armed, and who positioned himself in a target acquisition stance pointing a weapon in the direction of officers– unreasonable. *See Ford v. Childers,* 855 F.2d 1271, 1275 (7th Cir. 1988) (under the objective reasonableness standard, if it appears that an individual poses a serious threat of death or significant bodily harm, deadly force may be used if any misinterpretation of what appeared to be the case was reasonable under the particular facts and circumstances); *Henning,* 477 F.3d at 495 ("Deadly force…is

reasonable where an officer has probable cause to believe the suspect poses a danger of serious bodily harm, such as when the officer believes the suspect has a weapon or has committed a violent crime."); *Conley-Eaglebear v. Miller,* (No. 1:2014cv1175 (E.D. Wis. 2016)(officer shooting suspect in back as he was beginning to turn toward officer with a gun in his hand was justified in doing so because the suspect posed a serious threat of physical harm in making this movement).

The fact that Plaintiff was ultimately determined to be unarmed does not bar Officer Hansen's entitlement to qualified immunity. In *Mason-Funk v. City of Neenah*, the Seventh Circuit affirmed summary judgment in favor of two police officers who mistakenly shot and killed a hostage who was attempting to escape a gunman during a standoff. 895 F.3d at 507-510. There the Court concluded that the officers made a mistake, a tragic mistake, but it does not follow that they violated the hostage's Fourth Amendment rights. *Id.* Police have been held justified in using deadly force when they have reason to believe that a suspect is armed, even if it later turns out they were mistaken. *Slattery v. Rizzo*, 939 F.2d 213 (4th Cir. 1991) (holding deadly force reasonable where officer could have had probable cause to believe that suspect posed deadly threat even though suspect turned out to be unarmed); *see also Sherrod v. Berry*, 856 F.2d 802 (7th Cir. 1988) (*en banc*) (holding that under circumstances of the case, fact that suspect was unarmed was irrelevant to excessive force claim where officer reasonably believed he was armed).

Officer Hansen did not violate clearly established law when he used deadly force against a suspect he believed to be armed, even if it was later determined the suspect was only pretending to be armed. *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). To the contrary, the well-established law in the Supreme Court and this Circuit demonstrates that law enforcement officers can reasonably exercise the use of deadly force if another officer, or those in the immediate vicinity in

13

imminent danger of death or serious bodily injury. *Siler v. City of Kenosha*, 957 F.3d 751 (7th Cir. 2020).

In sum, Officer Hansen is entitled to qualified immunity from Plaintiff's Fourth Amendment claims.

## CONCLUSION

For the reasons stated above, Defendant respectfully requests the Court dismiss all of Plaintiff's claims against him, with prejudice.

Dated at Wauwatosa, Wisconsin this 30th day of July, 2021.

**GUNTA LAW OFFICES, S.C.**
Attorneys for Defendant

*/s/ Jasmyne M. Baynard*
Gregg J. Gunta, WI Bar No. 1004322
Ann C. Wirth, WI Bar No. 1002469
Jasmyne M. Baynard, WI Bar No. 1099898
Kyle R. Moore, WI Bar No. 1101745
9898 W. Bluemound Road, Suite 2
Wauwatosa, Wisconsin 53226
Telephone: (414) 291-7979
Facsimile: (414) 291-7960
Emails: gjg@guntalaw.com
acw@guntalaw.com
jmb@guntalaw.com
krm@guntalaw.com